**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Aramark Corp. v. Harris*, **Slip Opinion No. 2025-Ohio-2114.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-2114

ARAMARK CORPORATION, APPELLANT, *v*. HARRIS, TAX COMMR., APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Aramark Corp. v. Harris*, Slip Opinion No. 2025-Ohio-2114.]**

*Taxation—Commercial-activity tax ("CAT")—Gross-receipts exclusion in context of agency relationship—R.C. 5751.01(F)(2)(l) and (N)(2)— R.C.5751.02(A)—Corporation not entitled to gross-receipts exclusion under CAT statute, because by keeping for itself reimbursements it received from its clients for goods and services it purchased for those clients, corporation did not hold reimbursements on behalf of or as representative of another and therefore was not acting as clients' agent—Board of Tax Appeals' decision affirmed.*

(No. 2023-1540—Submitted February 12, 2025—Decided June 18, 2025.)

APPEAL from the Board of Tax Appeals, No. 2019-2975.

_____

SHANAHAN, J., authored the opinion of the court, which FISCHER, DEWINE, BRUNNER, and DETERS, JJ., joined. KENNEDY, C.J., dissented, with an opinion joined by HAWKINS, J.

**SHANAHAN, J.**

{¶ 1} Ohio levies its commercial-activity tax ("CAT") "on each person or entity with taxable gross receipts above a certain threshold for the privilege of doing business in Ohio." *Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 2018-Ohio-4488, ¶ 1, citing R.C. 5751.01 et seq. The question presented in this case is whether appellant, Aramark Corporation, has met the requirements for a gross-receipts exclusion under the CAT statute and is entitled to a refund. Appellee, Tax Commissioner Patricia Harris, determined that Aramark did not meet the statute's exclusion requirements and denied Aramark's request for a refund. BTA No. 2019-2975, 7 (Oct. 31, 2019). The Board of Tax Appeals affirmed that decision. BTA No. 2019-2975, 2023 WL 7431918, *7 (Nov. 6, 2023).

{¶ 2} Aramark appealed, reiterating as its main view that it is subject to the gross-receipts exclusion under the CAT statute because the reimbursements it received from certain clients were made within the context of a principal-agent relationship, with Aramark acting as the clients' agent for the benefit of the clients' food-service programs. Alternatively, Aramark argues that the reimbursements it received from those clients are not subject to the CAT, because those reimbursements are not taxable gross receipts.

{¶ 3} We affirm the board's decision, albeit for reasons that differ from those given by the board.

## I. BACKGROUND

{¶ 4} Aramark provides food services to clients in multiple industries, such as business dining, education, sports and entertainment, healthcare, and corrections.

To furnish these services, Aramark purchases food, labor, and miscellaneous materials (e.g., packaging) from third-party vendors.

{¶ 5} Aramark provides these services under two main types of contracts: profit-and-loss contracts and management-fee contracts. Under a management-fee contract, the client reimburses Aramark for its purchase of food, labor, and miscellaneous materials from third-party vendors—thus, taking ownership of the inventory—and pays Aramark a management fee. Because the management-fee client owns the inventory, it earns a profit or suffers a loss depending on whether its register receipts (i.e., sales) exceed its expenses. By comparison, under a profit-and-loss contract, Aramark maintains ownership of the inventory and keeps the receipts earned at the register, thus bearing the risk of loss.

{¶ 6} This case concerns the taxability of the reimbursements Aramark received under its management-fee contracts for the period July 2012 through December 2016. For that period, Aramark reported and paid the CAT on the reimbursements it received from its management-fee clients—that is, Aramark paid the tax on the reimbursements it received for purchasing food, labor, and miscellaneous materials for its management-fee clients, and it paid the tax on the management fees it earned under each contract.

{¶ 7} Aramark later filed a $907,532 refund claim with the tax commissioner for the CAT it paid on the reimbursements received from its management-fee clients.[1] Aramark argued that it was entitled to this refund under R.C. 5751.01(F)(2)(l), which excludes from the definition of "gross receipts" any "[p]roperty, money, and other amounts received or acquired by an agent on behalf of another in excess of the agent's commission, fee, or other remuneration." In Aramark's view, it acted as an agent for its management-fee clients by making purchases on their behalf and receiving reimbursement for those purchases from

---

1. Aramark concedes that the management fees it received are subject to the CAT, and it is not seeking a refund for the CAT paid on those fees.

the clients, thereby entitling it to a CAT exclusion for the reimbursement amounts. The tax commissioner disagreed and denied the refund claim. BTA No. 2019-2975 at 7 (Oct. 31, 2019).

{¶ 8} Aramark appealed to the board. The board affirmed the tax commissioner's denial of Aramark's refund claim, concluding that Aramark had failed to establish the existence of an agency relationship between itself and its management-fee clients. Citing principally this court's decision in *Willoughby Hills*, the board determined that to qualify for the agency exclusion, Aramark needed to show that it was endowed with actual authority to bind its clients to its activities with third-party vendors. 2023 WL 7431918 at *5. But the board found nothing in the terms of Aramark's management-fee contracts that created the type of relationship necessary for it to qualify for the CAT exclusion as an agent for its clients. *Id.* at *5-6. The board also rejected Aramark's alternative argument that eschewed reliance on the agency exclusion, finding "illogical" Aramark's view that the reimbursements it received from its management-fee clients did not constitute gross receipts under R.C. 5751.01(F). *Id.* at *6. This appeal followed.

## II. ANALYSIS

{¶ 9} Our function is to determine whether the board's decision was reasonable and lawful, s*ee* R.C. 5717.04, and we apply de novo review to the board's resolution of legal questions, *see Willoughby Hills*, 2018-Ohio-4488, at ¶ 12.

### A. *Aramark's first proposition of law*

{¶ 10} Aramark argues in its first proposition of law that the reimbursements it received from its management-fee clients do not constitute gross receipts under the CAT statute or under relevant administrative regulations and guidance, because Aramark received those reimbursements in its capacity as the clients' agent. We disagree.

4

### 1. The CAT statute

{¶ 11} We begin by considering the relevant language of the CAT statute. "In doing so, we do not ask what did the general assembly intend to enact, but what is the meaning of that which it did enact." (Cleaned up.) *Total Renal Care, Inc. v. Harris*, 2024-Ohio-5685, ¶ 13. "When a statute's meaning is unambiguous, our task is at an end—we must apply the statute as written." *Id.*

{¶ 12} The CAT is "levied . . . on each person with taxable gross receipts for the privilege of doing business in this state." R.C. 5751.02(A). Subject to certain exceptions, the term "'gross receipts' means the total amount realized by a person, without deduction for the cost of goods sold or other expenses incurred, that contributes to the production of gross income of the person." R.C. 5751.01(F).

{¶ 13} At issue here is the gross-receipts exception that arises in the context of an agency relationship. For purposes of the CAT statute, "gross receipts" excludes "[p]roperty, money, and other amounts received or acquired by an agent on behalf of another in excess of the agent's commission, fee, or other remuneration." R.C. 5751.01(F)(2)(l). In the same context, "'[a]gent' means a person authorized by another person to act on its behalf to undertake a transaction for the other, including . . . [a] person retaining only a commission from a transaction with the other proceeds from the transaction being remitted to another person." R.C. 5751.01(N)(2) (formerly codified in R.C. 5751.01(P), the definition of "agency" was moved to division (N) of the statute effective Oct. 3, 2023, but remains substantively unchanged, *see* 2023 Am.Sub.H.B. No. 33, Section 101.01, at 27, 2746).

{¶ 14} Contrary to what Aramark argues, Aramark does not meet the definition of "agent" under R.C. 5751.01(N)(2).[2] Decisive here is the statute's use

---

2. The dissent would also consider whether Aramark falls within R.C. 5751.01(N)'s general definition of "agent." We focus here on the specific definition in R.C. 5751.01(N)(2) because that is what Aramark focused on in its merit brief. And at oral argument, Aramark reaffirmed its reliance on R.C. 5751.01(N)(2).

of the word "retaining," which is the present participle of "retain." In the sense relevant here, "retain" means "to hold or continue to hold in possession or use: continue to have, use, recognize, or accept: maintain in one's keeping." *Webster's Third New International Dictionary* (2002). Here, Aramark has failed to show that it did not Bhold, have, or keep the reimbursements that it received from its management-fee clients. Indeed, the record lacks any evidence establishing that Aramark passed on to its third-party vendors the reimbursements it received from its management-fee clients.

{¶ 15} Even if Aramark could show that it meets the definition of "agent" under R.C. 5751.01(N)(2), that would not end the matter, for Aramark would still need to show that it meets the terms of the gross-receipts exclusion set forth in R.C. 5751.01(F)(2)(l). We have little difficulty concluding that the reimbursements Aramark received from its management-fee clients fall outside the exclusion. This is because Aramark did not "receive[] or acquire[]" the reimbursements "on behalf of another," R.C. 5751.01(F)(2)(l). Rather, as our analysis above makes clear, Aramark acquired the reimbursements on behalf of itself.

{¶ 16} The dissent sees things differently, arguing that Aramark meets the definition of "agent" under R.C. 5751.01(N)(2) and that the reimbursements Aramark received from its management-fee clients should be excluded from its gross receipts under R.C. 5751.01(F)(2)(l). With regard to R.C. 5751.01(N)(2), the dissent would find that Aramark's only profit is its management fee because its process of purchasing goods and services for its management-fee clients and receiving reimbursement from the clients for those purchases is a financial wash. *See* dissenting opinion, ¶ 59-60. As a matter of economic logic, the dissent has a point. But because profit is not the criterion for establishing whether a person or entity constitutes an "agent" under the definition set forth in R.C. 5751.01(N)(2), we do not consider it in our analysis.

**{¶ 17}** The dissent also would find that Aramark meets the requirements for excluding the reimbursements it received from its management-fee clients from its gross receipts under R.C. 5751.01(F)(2)(l) based on the synonymity between "on behalf of another" and "as the representative of." *See* dissenting opinion at ¶ 63-66. Because Aramark acted as the representative of its management-fee clients in procuring goods and services, the dissent concludes that the reimbursements Aramark received from its clients were received "on behalf of another," R.C. 5751.01(F)(2)(l). But the fact that Aramark purchased goods and services for its management-fee clients does not end the analysis. What Aramark seeks to exclude from its gross receipts is "money," *id.*, that it received from its clients in the form of reimbursements. And as we explained above, Aramark kept for itself the reimbursements that it acquired; it did not hold them on behalf of or as the representative of another. Even if Aramark was acting as an agent when it purchased goods and services for its management-fee clients, it was acting on behalf of itself when it received reimbursements from its clients for those purchases.

**{¶ 18}** In the end, it is the General Assembly that must prescribe what a taxpayer may exclude from its gross receipts, and because Aramark has not met the statutory requirements for the gross-receipts exclusion as an agent, we reject Aramark's first proposition of law. Even so, we would be remiss in not addressing one of the pillars of Aramark's argument, namely, that Aramark is an agent of its management-fee clients and therefore subject to the CAT exclusion based on this court's decision in *Willoughby Hills*. For the reasons that follow, we disapprove of the approach used in that case to interpret the statutory definition of "agent" for purposes of the CAT. We apply here the definition of "agent" based on the words the General Assembly used in the statute, not the gloss that was put on those words in *Willoughby Hills*.

{¶ 19} *Willoughby Hills* was a CAT-refund case in which we addressed the clause that is now found in R.C. 5751.01(N) providing that an "'[a]gent' means a person authorized by another person to act on its behalf to undertake a transaction for the other." *See Willoughby Hills*, 2018-Ohio-4488, at ¶ 23. We determined that the statute "does not define the type of authority that must be bestowed on a person or entity to create an agency relationship for CAT purposes," *id.* at ¶ 25, and provided guidance on the type of authority that would create such a relationship.

{¶ 20} In providing that guidance, this court relied on its decision in *Cincinnati Golf Mgt., Inc. v. Testa*, 2012-Ohio-2846. In that case, the City of Cincinnati had contracted with a company to manage the city's golf courses. The question presented was whether the management company's purchases from third-party vendors for such things as payroll services were exempt from use tax under the political-subdivision exemption set forth in R.C. 5739.02(B)(1) because the company acted as an agent for the city in making those purchases. *Id.* at ¶ 1; *id.* at ¶ 19, citing R.C. 5741.02(C)(2). Although the statute did not expressly state that an agent could claim the principal's tax exemption, this court agreed that the exemption could apply to a transaction in which an entity acts as a purchasing agent for a city. *Id.* at ¶ 23. To do so, however, we held that the management company had to show that it had actual authority to act on the city's behalf, such that it could bind the city to its purchases. *Id.* at ¶ 24-25.

{¶ 21} Following the reasoning applied in *Cincinnati Golf Mgt.*, this court in *Willoughby Hills* determined that for purposes of the CAT, a person is "authorized" to act on behalf of another when that person has *actual authority* to act as an agent on the other's behalf. *Willoughby Hills* at ¶ 27. That was a mistake. First, because the statutory definition says nothing about the type of authority a person must have to qualify as an agent for CAT purposes, we should have left the statute as we found it. By requiring a showing of actual authority for a person to qualify as an "agent," we imposed an interpretive gloss on the definition, departing

from settled rules of statutory interpretation by inserting words into the statute that the General Assembly did not prescribe. *See In re Application of E. Ohio Gas Co.*, 2023-Ohio-3289, ¶ 13 ("In matters of statutory interpretation, this court cannot insert or delete words."). Second, *Cincinnati Golf Mgt.* was the wrong place to look for guidance when deciding *Willoughby Hills*. The issue in *Cincinnati Golf Mgt.* involved an agency exemption for purposes of the use tax, not the CAT. And "agent" is statutorily defined with regard to the CAT, whereas in *Cincinnati Golf Mgt.*, there was not an applicable statutory definition, so this court used a definition of "agency" as previously used by Ohio's courts of appeals and otherwise referred to the Restatement of the Law 3d, Agency. *See Cincinnati Golf Mgt.* at ¶ 20, 24.

{¶ 22} The interpretive gloss we adopted in *Willoughby Hills* has led the parties in this case to base their arguments on whether Aramark had actual authority to make purchases on behalf of its management-fee clients. We can hardly fault the parties for this—we invited it in deciding *Willoughby Hills* the way we did. Unfortunately, in that case we stepped outside the bounds of our statutory-interpretation principles. We accordingly disapprove of *Willoughby Hills* to the extent that it requires a showing of actual authority on the part of the taxpayer to qualify as an agent for purposes of the CAT. Decisions involving the CAT's agency exclusion should focus on the meaning of the relevant statutory language. *See Great Lakes Bar Control, Inc. v. Testa*, 2018-Ohio-5207, ¶ 9, quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) ("'The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" [Boldface deleted in *Great Lakes Bar Control*.]).

{¶ 23} We could stop there. Because Aramark has not met the statutory definition of "agent" to qualify for the CAT exclusion, that ends the inquiry—no matter what the tax commissioner has said to the contrary in a rule or other administrative guidance. However, because Aramark has relied on administrative

sources issued by the tax commissioner, we address Aramark's arguments based on those sources below.

## 2. Administrative sources

{¶ 24} Aramark claims that it qualifies for a CAT refund under the agency exclusion based on (1) Adm.Code 5703-29-13, (2) an advisory opinion the tax commissioner issued in 2008, and (3) a final determination the tax commissioner issued in another case in 2019.

{¶ 25} We start by considering the rule and the advisory opinion together. Even assuming that these two sources could furnish an independent basis for excluding from taxation reimbursements Aramark received from its management-fee clients (which they do not), Aramark's argument based on these administrative sources fails.

{¶ 26} Although Aramark does not expressly say so, it ties its argument in support of an agency relationship to Adm.Code 5703-29-13(C)(2)(c). That subsection of the administrative rule addresses a fact pattern involving a general contractor engaged by a property owner to construct a building, with the general contractor acting as the owner's agent and in the owner's best interests under the terms of a contract. The advisory opinion applies that rule to an analogous fact pattern. *See* 2008 Ohio Tax Commr.Ops. No. 08-0012, https://dam.assets.ohio.gov /image/upload/tax.ohio.gov/legal/08cat_opinion080012_ral.pdf (accessed Apr. 4, 2025) [https://perma.cc/EEJ9-HNN2]. In both the rule and the advisory opinion, the tax commissioner contemplates that the general contractor can exclude from its gross receipts the money it receives from the owner to pay the subcontractors because, in that situation, the general contractor is acting as a "conduit" for the payments made by the owner to the subcontractors. *See* Adm.Code 5703-29-13(C)(2)(c); 2008 Ohio Tax Commr.Ops. No. 08-0012, at 2.

{¶ 27} But here, Aramark is not acting as a payment conduit. The record shows that Aramark incurs expenses on behalf of its management-fee clients, then

10

receives reimbursement from the clients. Nothing in the record establishes that Aramark passes these reimbursements on to its third-party vendors. Aramark's reliance on its contract with the University of Toledo does not point in a different direction. The portions of that contract Aramark cites in support of its position say nothing about a procedure for passing reimbursements on to third-party vendors through Aramark; rather, the contract speaks solely to the university's obligation to pay Aramark for the costs that Aramark incurs.

{¶ 28} Finally, Aramark relies on a final determination the tax commissioner issued in a 2019 tax-refund claim. But in that final determination, the tax commissioner addressed a question arising under Ohio's use tax, not the CAT. *See In re Sodexo Operations, L.L.C.*, Ohio Dept. of Taxation, Final Determination, Refund Claim No. 201203999 (Jan. 28, 2019). For this reason alone, Aramark's reliance on that final determination is misplaced.

*B. Aramark's second proposition of law*

{¶ 29} In Aramark's second proposition of law, which it advances as an alternative to its agency-based arguments, Aramark argues that the reimbursements it received from its management-fee clients do not constitute gross receipts, because they did not contribute to the production of gross income. We disagree.

{¶ 30} Aramark bases its argument on R.C. 5751.01(F), which provides that "'gross receipts' means the total amount realized by a person, without deduction for the cost of goods sold or other expenses incurred, that contributes to the production of gross income of the person." The problem with Aramark's argument is that it fails to account for the rest of division (F) of the statute. Relevant here is R.C. 5751.01(F)(1), which provides examples of gross receipts. The example in R.C. 5751.01(F)(1)(b) is most apt; it identifies as gross receipts "[a]mounts realized from the taxpayer's performance of services for another." Here, the evidence establishes that Aramark received reimbursements from its management-fee clients in exchange for performing services for those clients under its contracts with them.

Under R.C. 5751.01(F)(1)(b), those reimbursements constitute gross receipts for Aramark.

{¶ 31} In an attempt to illustrate why the reimbursements it received from its management-fee clients should not be counted as gross receipts, Aramark uses an example given in a CAT information release in which the tax commissioner defined "taxable gross receipt." However, Aramark's reliance on that information release is unavailing. The information release presents a hypothetical scenario in which a customer purchases $75 in groceries but presents a check to the grocery store cashier for $100. *See* Ohio Dept. of Taxation, Information Release No. CAT 2005-17, at 1 (rev. Apr. 2006), https://dam.assets.ohio.gov/image/upload /tax.ohio.gov/commercial_activities/information_releases/cat200517.pdf (accessed Apr. 4, 2025) [https://perma.cc/A5HY-UL9S]. Upon receiving the check, the cashier hands the customer $25 in cash, retaining $75 for the customer's purchase of groceries. *Id.* In the information release, the tax commissioner concludes that the grocery store is required to include only $75 in its calculation of gross receipts because that is the amount that contributes to the store's production of gross income. Had the grocery store charged the customer a fee for essentially providing the customer with a check-cashing service, that fee would be included in the store's gross receipts. Aramark argues that its facts are analogous to the facts in the hypothetical: Aramark receives reimbursements from its management-fee clients in the same way the grocery store received a check for $25 in excess of the amount of groceries it sold. Aramark's reasoning does not follow. Unlike in the grocery store scenario, Aramark receives reimbursements and those reimbursements remain with Aramark. They are not paid to Aramark's third-party vendors. The reimbursements do contribute to Aramark's gross income.

{¶ 32} We reject Aramark's second proposition of law.

### III. CONCLUSION

{¶ 33} The Board of Tax Appeals' decision is reasonable and lawful. We therefore affirm its decision.

Decision affirmed.

_____

**KENNEDY, C.J., joined by HAWKINS, J., dissenting.**

{¶ 34} To do business in Ohio, companies must pay the commercial-activity tax ("CAT"). Exempt from that tax, however, are "agents" who receive payments "on behalf of another." Appellant, Aramark Corporation, manages food and labor services for its clients in Ohio and across the country and sometimes enters into management-fee contracts with those clients. Under a management-fee contract, Aramark purchases goods and labor on its clients' behalf. The clients reimburse Aramark for those purchases and pay it a management fee for its services. Because Aramark meets the statutory definition of "agent" under that arrangement and because Aramark's clients reimburse it "on behalf of another," I dissent from the court's judgment affirming the decision of the Board of Tax Appeals ("BTA"). Instead, I would reverse the BTA's decision and remand the case to the BTA for recalculation of Aramark's tax obligation.

### Law and Analysis

*Introduction*

{¶ 35} The CAT is an annual tax on gross receipts for "the privilege of doing business in this state." R.C. 5751.02(A). "Gross receipts" are "the total amount realized by a person," R.C. 5751.01(F), or a corporation, R.C. 5751.01(A).

{¶ 36} But that definition "is not without limits." *Willoughby Hills Dev. & Distrib., Inc. v. Testa*, 2018-Ohio-4488, ¶ 14. Relevant here, R.C. 5751.01(F)(2)(l) exempts from the CAT "[p]roperty, money, and other amounts received or acquired by an *agent on behalf of another* in excess of the agent's commission, fee, or other remuneration." (Emphasis added.)

{¶ 37} The majority relies on R.C. 5751.01(N)(2)[3] to determine whether Aramark is an agent for its management-fee clients. That provision states that "'[a]gent' means a person authorized by another person to act on its behalf to undertake a transaction for the other, including . . . [a] person retaining only a commission from a transaction with the other proceeds from the transaction being remitted to another person." The majority reasons that Aramark is not an agent for its management-fee clients under R.C. 5751.01(N)(2), because Aramark does not "retain" only a commission from the transactions it undertakes on their behalf. Majority opinion, ¶ 14. The majority also states that Aramark does not acquire any reimbursements "on behalf of another." *Id.* at ¶ 15.

{¶ 38} But that reasoning is flawed in three ways. First, by ignoring the comma preceding the word "including" in R.C. 5751.01(N), the majority fails to apply the general definition of "agent," which Aramark satisfies. The majority should have read the words preceding the comma as a complete sentence and read the list following "including" as nonexhaustive. Second, Aramark is an agent under R.C. 5751.01(N)(2) as well because it does retain only a commission from its transactions with its management-fee clients. Third, the majority misunderstands the meaning of the phrase "on behalf of another," R.C. 5751.01(F)(2)(l).

{¶ 39} Accordingly, this dissent begins with the general definition of "agent" in R.C. 5751.01(N) and proceeds to consider the example definition of "agent" in R.C. 5751.01(N)(2). It then concludes by addressing the meaning of "on behalf of another" in R.C. 5751.01(F)(2)(l).

*Aramark is an agent under R.C. 5751.01(N)*

{¶ 40} Determining whether Aramark is exempt from the CAT returns us to a familiar place, statutory interpretation. As this court has long explained, "[t]he

---

3. Effective October 3, 2023, the definition of "agency" that was formerly codified in R.C. 5751.01(P) was moved to division (N) of the statute. *See* 2023 Am.Sub.H.B. No. 33, Section 101.01, at 27, 2746. The definition itself remained substantively unchanged.

question is not what did the general assembly intend to enact, but what is the meaning of that which it did enact." *Slingluff v. Weaver*, 66 Ohio St. 621 (1902), paragraph two of the syllabus. And as always, this court applies clear and unambiguous statutes as written. *See Boley v. Goodyear Tire & Rubber Co.*, 2010-Ohio-2550, ¶ 20, citing *Cheap Escape Co., Inc. v. Haddox, L.L.C.*, 2008-Ohio-6323, ¶ 9.

{¶ 41} R.C. 5751.01(N) defines "agent" as "a person *authorized* by another person to act on its behalf to undertake a transaction for the other, including any of the following." (Emphasis added.) The statute's grammatical structure conveys that the phrase before "including" should be read as a complete sentence that defines "agent." *See Look Ahead Am. v. Stark Cty. Bd. of Elections*, 2024-Ohio-2691, ¶ 19 (applying rules of punctuation to determine the plain meaning of a statute).

{¶ 42} Moreover, the term "including" does not limit us to looking at only the enumerated examples that follow, because as this court has recognized, "'[i]ncluding' is a word of expansion rather than one of limitation or restriction." *In re Hartman*, 2 Ohio St.3d 154, 156 (1983); *Craftsman Type, Inc. v. Lindley*, 6 Ohio St.3d 82, 83 (1983) (same). "[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99 (1941). For these reasons, the court's analysis should have started—and ended—with R.C. 5751.01(N).

{¶ 43} As noted above, an "agent" under R.C. 5751.01(N) is "a person *authorized* by another person to act on its behalf to undertake a transaction for the other." (Emphasis added.) The statute does not define "authorized," so we apply its ordinary meaning. *See Satterfield v. Ameritech Mobile Communications, Inc.*, 2018-Ohio-5023, ¶ 18. Both prior judicial construction and dictionaries are useful for discerning the ordinary meaning of terms that a statute leaves undefined. *See*

*Carcieri v. Salazar*, 555 U.S. 379, 388-389 (2009); *see also State v. Turner*, 2020-Ohio-6773, ¶ 18.

{¶ 44} This court has previously defined the term "person authorized" as a person who is "endowed with authority." *Willoughby Hills Dev. & Distrib.*, 2018-Ohio-4488, at ¶ 24, citing *Webster's Third New International Dictionary* (2002). *Black's Law Dictionary* (10th Ed. 2014) defines "authorize" as "[t]o give legal authority; to empower" or "[t]o formally approve; to sanction." So, Aramark is an agent if its management-fee clients give it the "authority" to "undertake a transaction," R.C. 5751.01(N), on their behalf.

{¶ 45} Aramark has shown that it has the authority to undertake transactions for its management-fee clients. Consider testimony that Christopher Moore, Aramark's national account director for Nationwide Insurance Company, gave at the hearing before the BTA. He testified that under its management-fee contracts, Aramark "purchase[s] food and hire[s] the labor . . . on behalf of the clients" and that "Aramark is reimbursed for all food, labor," and nonfood items that it purchases.

{¶ 46} Moore even gave an example of how a management-fee contract works: If Aramark enters into a contract with Sysco, one of its suppliers, to purchase $10,000 worth of product to supply to Nationwide, then Nationwide receives a $10,000 invoice from Aramark. But if Aramark goes over the client-approved budget, Nationwide still must reimburse Aramark. After completing the transaction, Aramark retains only the management fee that Nationwide pays it, but Nationwide benefits from Aramark's "economy of scale," allowing Nationwide to "focus on [its] core business."

{¶ 47} Aramark's account manager for Hilliard City Schools, David Wilson, stated the same. He testified that under Aramark's contract with Hilliard City Schools, the school district "pays all of the expenses" associated with the

goods that Aramark provides the school district and that "in addition to reimbursing Aramark for costs associated with the program, there is a fee that's included."

{¶ 48} Aramark presents four management-fee contracts—with Hilliard City Schools, the Columbus College of Art and Design, Nationwide Insurance, and the University of Toledo—all of which confirm the above testimony.

{¶ 49} *Hilliard City Schools*. In this contract, "[i]f [Aramark] is procuring goods or services which are being charged to [Hilliard City Schools], [Aramark] is acting as an agent" under the contract. That language gives Aramark the power to contract on the school district's behalf. *See Saunders v. Allstate Ins. Co.*, 168 Ohio St. 55, 58-59 (1958) ("acts of an agent within the scope of what he is employed to do and with reference to a matter over which his authority extends are binding on his principal"). Furthermore, the contract provides that "[a]ny rebates, discounts, or commissions" that Aramark receives "must be returned to the nonprofit school food service account" because "[o]nly net costs may be charged to [Hilliard City Schools]."

{¶ 50} The contract also lists in columns the labor expenses for which Hilliard City Schools must reimburse Aramark, stating the following: "[Aramark] guarantees to [Hilliard City Schools] that [Aramark] shall be responsible for the expenses as checked under Column I," and "[Aramark] shall factor these expenses into the fees that will be billed to [Hilliard City Schools]." The provision that requires Aramark to return rebates, discounts, or commissions to the school account indicates that Aramark is simply making purchases for Hilliard City Schools. These provisions require the school district to reimburse Aramark, meaning that Aramark has the authority to "undertake transactions" on the school district's behalf.

{¶ 51} *Columbus College of Art and Design.* The Columbus College of Art and Design contract states that Aramark is the college's "exclusive agent," with the responsibility of purchasing "food, supplies and services," and that the college "shall be billed for purchases made [under the contract] as such food and supplies

are utilized in the Campus Food Service Program." Again, these provisions indicate that Aramark has the power to undertake transactions on its clients' behalf because the clients must reimburse Aramark for the costs it incurs.

{¶ 52} *Nationwide Insurance*. The Nationwide contract gives Aramark the ability to bind Nationwide for certain expenses. Nationwide must reimburse Aramark "for costs incurred . . . in providing services to locations." Aramark itemizes those expenses and invoices them to Nationwide, and the contract requires Nationwide to reimburse Aramark within 30 days. This language empowers Aramark to undertake transactions on Nationwide's behalf for which Nationwide must reimburse Aramark.

{¶ 53} *University of Toledo*. The University of Toledo's contract is the same. It states that the university "shall be billed for purchases made [under the contract] as such food and supplies are utilized in the Dining Services Operations." Consistent with the other contracts Aramark introduces, it makes purchases on the University of Toledo's behalf for which the university must reimburse Aramark.

{¶ 54} In a footnote, the majority takes issue with the discussion in this section, stating that it does not address R.C. 5751.01(N) because that is not what Aramark focused on in its brief. Majority opinion at ¶ 14, fn. 2. However, the BTA's decision addressed whether Aramark was an agent under the general definition in R.C. 5751.01(N). BTA No. 2019-2975, 2023 WL 7431918, *4-5 (Nov. 6, 2023). And in circumstances in which a lower tribunal may make the same mistake again, "our prudential policy against addressing arguments not raised by the parties is not a barrier to addressing and remedying a clear mistake before it is repeated." *State ex rel. Maxcy v. Saferin*, 2018-Ohio-4035, ¶ 14.

{¶ 55} In sum, under R.C. 5751.01(N), Aramark is an agent because its arrangements with its management-fee clients allow it to undertake transactions with third parties on behalf of those clients, who must then reimburse Aramark for the costs associated with those transactions.

18

*Aramark is an agent under R.C. 5751.01(N)(2)*

{¶ 56} Aramark is an agent under R.C. 5751.01(N), but it is also an agent under R.C. 5751.01(N)(2), the provision the majority uses to analyze this case. R.C. 5751.01(N)(2) defines "agent" as "including . . . [a] person *retaining only a commission* from a transaction with the other proceeds from the transaction being remitted to another person." (Emphasis added.) The issue is whether Aramark "retain[ed] only a commission from" the transactions it entered into for its management-fee clients.

{¶ 57} The majority states that Aramark "has failed to show that it did not hold, have, or keep the reimbursements that it received from its management-fee clients." Majority opinion at ¶ 14. The majority even finds that "the record lacks any evidence establishing that Aramark passed on to its third-party vendors the reimbursements it received." *Id.*

{¶ 58} But the ordinary meaning of "retain" refutes that interpretation. To "retain" means "to hold or continue to hold in possession or use: continue to have, use, recognize, or accept: maintain in one's keeping." *Webster's Third New International Dictionary* (2002).

{¶ 59} Aramark has ongoing relationships with its clients and third-party vendors. So, as Moore testified, when a management-fee client reimburses Aramark for one monthly invoice, it uses those funds to pay for the next month's goods and services, meaning that the only profit Aramark "continues to hold" is its management fee. That being the case, the record does contain evidence that under a management-fee contract, Aramark passes along to its third-party vendors the reimbursements from its clients.

{¶ 60} The example that Moore gave during his testimony helps illustrate that Aramark retains only a commission from its management-fee clients. Say Aramark purchases, on a client's behalf, $10,000 worth of food from Sysco; the client must reimburse Aramark its $10,000 and pays Aramark a management fee.

Aramark uses that money to pay for next month's order. In the end, Aramark "retains" only a management fee.

{¶ 61} The majority agrees "[a]s a matter of economic logic" that Aramark's profit is only its management fee. Majority opinion at ¶ 16. But the majority ultimately dismisses that fact as irrelevant, reasoning that "profit is not the criterion" for determining whether Aramark is an agent under R.C. 5751.01(N)(2). Majority opinion at ¶ 16. I agree. Rather, the court should consider only what Aramark "retains," which is a management fee.

{¶ 62} Consequently, Aramark is an agent under R.C. 5751.01(N)(2) because it remits its proceeds monthly.

*Aramark's clients reimburse it "on behalf of another"*

{¶ 63} Because Aramark is an agent, the final question is whether Aramark's clients reimburse it "on behalf of another," R.C. 5751.01(F)(2)(l).

{¶ 64} The majority misunderstands the meaning of "on behalf of another," reasoning that "Aramark acquired the reimbursements on behalf of itself" because it does not "retain" the proceeds it receives, majority opinion at ¶ 15.

{¶ 65} But that does not comport with the plain meaning of the phrase. The majority should have applied the phrase's dictionary definition. "The plain and ordinary meaning of 'on behalf of' is 'in the interest of: as the representative of: for the benefit of.'" *Thomas v. Logue*, 2023-Ohio-3522, ¶ 27 (Kennedy C.J., dissenting), quoting *Webster's Third New International Dictionary* (1993).

{¶ 66} Aramark procures goods and services for its management-fee clients, so the "representative of" part of the definition makes the most sense here. Aramark acts as its clients' representative because it procures from its third-party vendors goods and services to its clients' benefit. But even reading R.C. 5751.01(F)(2)(l) as requiring an agent to act in the interest or benefit of another leads to the same result. That is because Aramark acts in the interests of its clients

when purchasing goods and services from its third-party vendors by obtaining for those clients the benefits of Aramark's economy of scale.

### Conclusion

{¶ 67} The General Assembly created an exemption to the CAT that applies when a corporation acts as an "agent . . . on behalf another," R.C. 5751.01(F)(2)(l). Aramark qualifies for that exemption. Because the majority holds the opposite, I dissent. I would reverse the BTA's decision and remand the case to the BTA for recalculation of Aramark's tax obligation.

————————————

Reed Smith, L.L.P., and Paul E. Melniczak, for appellant.

Dave Yost, Attorney General, and Raina Nahra Boulos and Daniel Kim, Assistant Attorneys General, for appellee.

Taft Stettinius & Hollister, L.L.P., Jeremy Hayden, Philip D. Williamson, and Javan A. Kline, urging reversal for amicus curiae, Ohio Chamber of Commerce.

————————————